Milton M. **LEVIN**, Petitioner,

v.

Nicholas deB. **KATZENBACH**, Respondent.

Habeas Corpus No. 95–65.

United States District Court
District of Columbia.

Oct. 25, 1966.

Thurman Arnold, Washington, D. C., for petitioner.

Harry T. Alexander and Oscar Altshuler, Asst. U. S. Attys., for respondent.

## MEMORANDUM

MATTHEWS, District Judge.

Following the grand larceny conviction of Milton M. Levin (Levin), the affirmance of his conviction by the United States Court of Appeals,[1] and the denial by the Supreme Court of certiorari,[2] Levin petitioned for a writ of habeas corpus and alternatively asked for an order vacating his conviction and granting a new trial. The District Court held that

he had failed to prove his allegation as to perjured testimony by a government witness and as to evidence deliberately suppressed by the trial prosecutor, and, accordingly, dismissed his petition. Levin v. Katzenbach, 249 F.Supp. 225 (D.C. 1965). He appealed.

By an order of the Court of Appeals filed December 23, 1965, the order of the District Court dismissing Levin's petition was reversed, and the case remanded to the District Court with direction to afford a hearing after the filing by the Court of Appeals of an opinion or opinions. On May 19, 1966, majority and minority opinions were filed.[3] Thereafter, on September 12, 1966, the District Court held the hearing directed by the Court of Appeals. It consisted of argument of counsel and a brief filed by Levin's counsel on September 7, 1966.

Before taking up the matters dealt with by the Court of Appeals in its order of December 23, 1965, and its opinion of May 19, 1966, a little background is necessary.

The charge against Levin of grand larceny by trick reads as follows:

On or about February 13, 1959, within the District of Columbia and within the jurisdiction of this Court, defendant Milton M. Levin did unlawfully, feloniously and wilfully steal, take and carry away the property of the Bakery and Confectionery Workers' International Union of America, an unincorporated association, entrusted to James G. Cross, President of said Union, the said property consisting of $35,000 in money in violation of Title 22, District of Columbia Code, Section 2201.[4]

1. Levin v. United States, 119 U.S.App. D.C. 156, 338 F.2d 265 (1964). The Court consisted of Chief Judge Bazelon, Judge Washington and Judge Bastian, Chief Judge Bazelon dissenting.

2. Levin v. United States, 379 U.S. 999, 85 S.Ct. 719, 13 L.Ed.2d 701 (1965).

3. The Court consisted of Chief Judge Bazelon, Judge Edgerton and Judge Burger, Judge Burger dissenting. Levin v.

Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287 (1966).

4. This charge is Count 2 in an indictment of three counts. Criminal No. 913–62. Count 1 charged James G. Cross, James Landriscina and others not named as defendants with conspiracy to effect a corrupt acquittal of Cross in his trial on a charge of perjury resulting from his testimony before the McClellan Committee. Levin was not named as a defendant in

It was the contention of the government at Levin's trial that Levin represented to Cross, President of the Union, and to Landriscina, another Union officer, that he could fix the trial of Cross for perjury if he were given $35,000 for that purpose; that $35,000 in cash of money belonging to the Union was turned over to Landriscina by direction of Cross; that Landriscina on or about February 13, 1959 delivered it to Levin to use in fixing the necessary parties; that Levin intended at the time he received the money to keep it for himself and to deprive the Union of. it, and that he did so.

If believed by the jury, as it evidently was, the government's evidence was sufficient to support the charge.[5] For present purposes, one aspect only of such evidence requires comment. It concerns the alleged *date* of transfer to Levin of $10,-000 (one of two payments totaling $35,-000). Landriscina testified that he gave Levin ten $1,000 bills on February 12, 1959; that at noon the same day Levin returned them and asked for smaller bills; that about an hour later the witness gave Levin $10,000 in $20 bills; that the rest of the money—$25,000, in $20 bills, was given to Levin the following day, February 13, 1959 at 5 p.m. Olson, the Union Treasurer, testified that he drew a $35,000 check under guise of a strike donation to be used to fix Cross' perjury trial, and cashed the check at a Bank on February 13, 1959 receiving therefor thirty-five $1,000 bills. Both Olson and Ashby, another Union officer, testified that Landriscina was given ten of these $1,000 bills on the morning of that same day, February 13, 1959. Ashby further testified that Landriscina on the same morning returned the ten $1,000 bills; that he (Ashby) then went to the Bank and had all thirty-five $1,000 bills exchanged for $20 bills; that he delivered $10,000 in $20 bills to Landriscina; that thereafter, in the afternoon, on the same day he delivered the remaining $25,000 in $20 bills to Landriscina. The evidence included the Union's cancelled check for $35,000 dated February 12, 1959, but cashed February 13, 1959. In light of the evidence that Landriscina did not receive the $10,000 until the morning of Friday, February 13, 1959, the Court of Appeals held:

> The jury thus could infer, if it credited this testimony and that of Landriscina that he paid the $10,000 to the appellant (Levin), that Landriscina was mistaken as to the date and that the transfer took place on February 13 instead of February 12.[6]

When Levin filed his petition for a writ of habeas corpus and alternatively asked for a new trial, the sole ground alleged for relief was that the government in its brief in opposition to certiorari had made an admission "to the effect that at least half of the testimony relied upon by the government is untrue."[7] By amendment to his petition Levin alleged as an additional ground for relief that the trial prosecutor suppressed bank records which would have shown that the thirty-five $1,000 bills obtained from the National Savings & Trust Company by Mr. Olson of the Bakery and Confectionery Workers' International Union were never changed into $20 bills,

---

the conspiracy count (Count 1), but it was alleged therein that he was paid by Landriscina a total of $35,000, the property of the Bakery and Confectionery Workers' International Union of America, which property was entrusted to James G. Cross, its president, and that Levin "did agree to accept and use $35,000 to pay undisclosed persons to corruptly effect" Cross' acquittal. Count 3 of the indictment charged Cross with having embezzled $35,000 from the Union. Landriscina plead guilty to the conspiracy count. Cross was found guilty as to that count and Count 3. Levin was tried separately and, of course, on Count 2 only, the jury returning a verdict of guilty.

5. Levin v. United States, 119 U.S.App.D.C. 156, 158, 338 F.2d 265, 267 (1964).

6. Levin v. United States, 119 U.S.App. D.C. 156, 160 n. 4, 338 F.2d 265, 269 n. 4 (1964).

7. The alleged admission reads as follows:
   Landriscina testified, apparently incorrectly, that he made the first payment of $10,000 on February 12.

"the denominations allegedly required by petitioner" (Levin) and that the trial prosecutor "made the Bank give him its records and suppressed them." The findings of fact of the District Court, as reported in Levin v. Katzenbach, 249 F. Supp. 225 (1965), do not sustain Levin's allegations.

The order of the Court of Appeals of December 23, 1965, reversing the District Court's order dismissing Levin's petition reads in pertinent part:

"WHEREAS, the prosecution, no doubt in complete good faith, did not disclose to the defense at or before trial certain information in its possession which had some bearing on the case; and

WHEREAS, the District Court did not find whether this nondisclosure was or was not negligent; and

WHEREAS, if it was negligent, according to the test to be stated in an opinion or opinions to be filed by this court, it would follow in the view of the majority of this court that the defendant should be released on habeas corpus;

Now, therefore, it is ORDERED by the court that the order appealed from herein is reversed and the case is remanded to the District Court with direction to afford a hearing and to determine whether the government was negligent and to grant or deny the writ in accordance with that determination * * *.

The foregoing order of December 23, 1965 was followed on May 19, 1966 by a majority and minority opinion of the Court of Appeals.

It is indicated in the majority opinion [8] of the Court of Appeals that its reversal of the order of the District Court concerns *"two pieces of evidence"* which the government had in its possession and did not make available to Levin at or prior to his trial.

The first piece of evidence is a check which the National Savings & Trust Company drew on the Riggs National Bank (for cash) for $35,000. This check was given under the following circumstances: After National Savings & Trust Company had cashed the check of the Union made out to Olson for $35,000 on February 13, 1959, giving therefor thirty-five $1,000 bills, the bank desired to replenish its supply of $1,000 bills, and did so by using a runner on that same day to take its check for $35,000 to the Riggs Bank and with it to secure thirty-five $1,000 bills. The Court of Appeals concedes that the check of the National Savings & Trust Company drawn on the Riggs Bank "by itself is not significantly probative" and "is inconclusive for present purposes." Nevertheless, the court goes on to say that "this check must be considered along with the second piece of evidence."

Turning now to the "second piece of evidence," it is a statement made in 1962 by Mr. McCeney, an officer of the National Savings and Trust Company, and used by the Government for impeachment purposes in McCeney's cross-examination when he was a witness at the habeas corpus hearing. Admitted in evidence as Government's Exhibit No. 4, the statement reads:

I hereby recall Mr. Olson coming in with a $35,000 check, dated February 13 (sic), 1959 to be cashed but I do not recall a telephone call from Mr. Olson to arrange the cashing of this check. Mr. Olson came in and I took him to Mr. Hooper, who, at that time, was running one of the savings windows and handling the large cash, to cash this check which he did in thousand dollar bills. I do not recall Mr. Ashby coming in to change the thousand dollar bills to smaller ones. If he did I would have taken him back to Mr. Hooper because he was handling the large bills. Mr. Hooper says he does not recall cashing this money into smaller bills that day. Our auditors checked the records for teller sheets of Mr. Hooper for February 13, 1959 and

8. Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287 (1966).

could not locate them as it is our policy to keep our sheets not later than two years. It is my understanding from the auditors that we do have the 1960 teller sheets in our files.

This statement was given under the following circumstances: About mid-year 1962 information first reached the attorney representing the Government before the Grand Jury that the thirty-five $1,000 bills received by Mr. Olson when he cashed the Union check had later been exchanged for smaller bills. Two special agents of the Grand Jury (who were also compliance officers of the Department of Labor) visited McCeney as the bank officer who allegedly had the exchange made. As a result, they obtained the foregoing statement from McCeney [9] and turned it over to said attorney.

Although Levin's counsel did not know at or prior to trial of the foregoing statement, he did have a copy of the Union check, and he knew that the $1,000 bills were allegedly exchanged for twenties. In addition, he talked before trial to McCeney and could have obtained whatever pertinent information McCeney possessed.

After its discussion of the "two pieces of evidence" which were not shown to Levin's counsel at or prior to trial, and in the concluding part of its opinion, the Court of Appeals presupposes: (1) that "Landriscina's credibility was weakened," and (2) that "the Government's case would have been further weakened had the defense been able to challenge Landriscina's and Ashby's stories about exchanging $1,000 bills for $20 bills, by showing that the bank officers remembered no such exchange although they clearly remembered cashing the Union's check." Then the Court says that:

"The question is whether this weakening might have led the jury to entertain a reasonable doubt about appellant's (Levin's) guilt"

and that the District Court is to decide the question.

*The Credibility of Landriscina*

The impression of the majority of the Court of Appeals that "Landriscina's credibility was weakened" hinges on Landriscina's testimony that February 12, 1959 was the date he transferred $10,000 to Levin, the testimony of other government witnesses through whom Landriscina got the $10,000 that the money was not delivered to Landriscina until February 13, 1959, and the Union check showing it was cashed on that date. This threshold impression of the Appellate Court that Landriscina's credibility was weakened is not shared at the trial court level.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause the jury to discredit such testimony. Two or more persons witnessing an incident or a transaction may see or hear it differently; and innocent misrecollection, like failure of recollection, is not an uncommon experience. In weighing the effect of a discrepancy, consideration is ordinarily given to whether it pertains to a matter of importance or an unimportant detail, and whether the discrepancy resulted from innocent error or wilful falsehood.

There was evidence that Landriscina and Levin had a series of meetings in January and February 1959, one when Vincent Belloni was present, two when Cross was present, and a number attended only by Landriscina and Levin. When Landriscina testified at Levin's trial, it was more than four years after such meetings. Under these circumstances, the jury may reasonably have looked upon the mentioned date discrepancy as no more than a normal variation which occurs when one person describes a series of events on different occasions. Certainty as to the exact date of an offense is not essential. Ledbetter v. United States, 170 U.S. 606, 612, 18 S.Ct. 774, 42 L.Ed. 1162 (1898). In the Levin trial the important issues were whether the money was received by Levin, and if

9. Transcript, Habeas Corpus No. 95–65, pp. 195, 196, 197, 198, 199.

so, whether he committed the larceny charged "on or about February 13, 1959" as alleged in the indictment. These issues, of course, were committed to the jury, and resolved by its verdict of guilty.

However, if Landriscina's credibility was weakened by the mentioned date discrepancy, the jury may reasonably have concluded that such weakness was overcome by the corroborating circumstantial evidence. When in 1964 the Court of Appeals affirmed Levin's conviction it pointed out that "[w]hile the testimony of Landriscina regarding Levin's receipt of the money was specifically denied by Levin, *there are corroborating circumstances which bear out the Government's case.*" (Emphasis supplied.) Levin v. United States, 338 F.2d 265, at page 267. It would prolong this discussion unduly to relate the corroborating circumstances.[10] Certainly the government's case against Levin did not hang by a single thread.

10. A few of them are indicated in the following:

(1) Following a conversation between Landriscina and Belloni (who knew Levin), they visited Levin in January 1959, and told him of the arrest of Cross on a perjury charge and of their desire to assist Cross. Levin was to look into the matter. Landriscina's testimony was that he again visited Levin and Levin told him he could fix the Cross perjury trial but that it would cost $35,000 to $40,000; and that he (Landriscina) went to see Cross in Washington. In the absence of Landriscina but at his request, Belloni visited Levin. Belloni testified: "I told him that Jimmy (Landriscina) had called me and told me that Mr. Levin wanted $35,000 for the case, and Jimmy had told me to speak to Mr. Levin to see if he could bring the price down and where the money was going. * * * Mr. Levin says no, that would be the price * * * What's the difference where the money would go as long as the job is done." Transcript, Criminal No. 913–62, p. 310.

(2) Landriscina also testified that he made an appointment for Levin to see Cross and that there were two meetings at a restaurant in Washington in early February 1959 at which he was present with Cross and Levin; that the $35,000 for fixing the perjury trial was agreed upon; that Levin said he had to have the money before the trial, and that *he* had "to get paid something" because after all he was "not making any pay here"; and that after some discussion Cross said he would use Levin as a lobby man and give him $17,500 a year. Thereafter on his letterhead Levin sent an undated bill to the Union for $17,500 "For *Services Rendered through February 28, 1959.*" Government's Exhibit No. 8. The jury evidently regarded this bill as having significance because during their deliberations they requested that it be sent in to them. (3) With Edward Bennett Williams representing Cross, the perjury trial took place on February 16 and 17, 1959, resulting in a directed verdict of acquittal. Levin had not in any way influenced the Court's decision. Landriscina testified that Levin was present on both days in the corridor outside the courtroom where Cross' trial was in progress, and that Levin assured him during the trial that the acquittal had been arranged. Felipe Espil corroborated the testimony of Landriscina as to the presence of Levin in the corridor outside the courtroom on the first day of Cross' trial. Espil was personal secretary to Cross and had met Levin about a month prior to the perjury trial and had thereafter had contacts with him. (4) Belloni testified that a few days after Cross' trial had ended, Levin called him on the telephone and told him "When I say something will be done, it is usually done." Transcript, Criminal No. 913–62, p. 312. (5) Landriscina testified that after he received a grand jury subpoena Levin told him to take the Fifth because "if you don't talk they cannot tell you that you gave me the thirty-five thousand dollars, and they cannot prove it because if you don't say, and they call me, I'll say I didn't get no money, and we will be clear," and that on the first occasion before the Grand Jury he did take the Fifth; but that later he told Levin he had received another subpoena and that he "was going to come over to Washington and tell the truth regards to the thirty-five thousand dollars"; that Levin insisted that he not talk and said "Well, if you go down here and tell them the truth, no jury will tell you they believe you in the court if the case goes on, because they have no use for a Union leader, no use for Union, and they don't believe you, but they will believe me when I take the stand." Belloni testified that Levin came to see him and told him that Landriscina had told him (Levin) that "he was coming to Washington and say that he gave him the $35,000" and that

### The Bank Officers and Their Recollection

It is asserted by the Court of Appeals that the Bank officers *clearly* remembered the cashing of the Union's $35,000 check. (Emphasis supplied.) If so, then a pertinent inquiry is as to when and how this remembrance came about.

The record shows that pursuant to a Labor Department investigation, Mr. Marzo, and another compliance officer of that Department, visited McCeney and Hooper on March 20, 1961, and made inquiry of them concerning the cashing of the $35,000 Union check for Mr. Olson on February 13, 1959. Although this interview with them on March 20, 1961 was the closest in time to the date the check was cashed, *neither McCeney nor Hooper could recall cashing the check.* Transcript, Habeas Corpus No. 95–65, pp. 208–211.

■ Not content with the failure of the recollection of McCeney and Hooper as to cashing the $35,000 Union check, the investigators returned to the Bank the next day, March 21, 1961. Obviously McCeney checked his Bank's records on that day or on the previous day after the investigators had gone. It is common knowledge that a bank keeps a microfilm or other photographic copy of each check drawn and cashed by its customer on an account in its bank. The Union check for $35,000 had on its face Hooper's teller number (25), and on its back McCeney's initials and Olson's endorsement. Such evidence undoubtedly suggested to the minds of McCeney and Hooper facts about the check cashing of which they had no recollection on March 20, 1961 at the time of the investigators' first inquiry. At the habeas corpus hearing Hooper admitted that McCeney called him in and told him that his teller stamp (25) was on the cashed check and, therefore, that he was the teller who had cashed the check.[11]

However, Hooper failed to remember either of the March 1961 visits of the investigators and could not say whether they were present when McCeney called him in to tell him he had cashed the Union check. Marzo testified that on his second visit Hooper said he did recall the cashing of the Union check, and delivered to him copies of certain bank records, including the check which the bank drew on the Riggs Bank to replenish its supply of $1,000 bills. Hooper testified that a copy of the Union check was one of the records the Bank gave the government. If so, presumably it was delivered to Marzo on his visit of March 21, 1961 as the prosecutor had no bank records other than those obtained through the Labor Department investigators, and the record herein is quite clear as to the records they obtained from the bank on other occasions. On their first visit, March 20, 1961, they secured from Mr. McCeney only four settlement sheets relating to occurrences in 1960, more than a year subsequent to the date of the larceny with which Levin was charged. On their last visit in September 1962 they obtained only the undated McCeney statement heretofore quoted.

Once having had their recollections of the check cashing reconstructed or revived by corporeal evidence—the Bank records—McCeney and Hooper continued to keep that check cashing in mind, doubtless assisted by the trouble it brought the Union and by Hooper's appearance before the Grand Jury in early August 1961—less than five months after the March 21, 1961 visit of the investigators.

The reason given Marzo by Hooper on March 20, 1961 for not remembering the cashing of the $35,000 Union check was that he "didn't regard this as too unusual." Transcript, Habeas Corpus No. 95–65, page 212. When, before the Grand Jury, inquiry was made of Hooper as to whether on February 13, 1959 there

---

11. Levin asked him (Belloni) if he "would speak to Jimmy not to say that, because as a lawyer it would hurt him." Transcript, Criminal No. 913–62, p. 325.

11. Transcript, Habeas Corpus, pp. 100, 101.

was "a specific purpose in maintaining a bank, if we may call it that, of $50,000," Hooper answered:

> Oh, yes; we *quite often* have this come up—someone wants thousand dollar bills—thirty-five, forty, sometimes less or more. We have had one occasion where we had over one hundred thousand request. We had to go over to the Treasury to get the difference. But we do try to keep this, because $50,000 usually takes care of any demand of getting a check cashed. Government's Exhibit No. 3, pages 6, 7. (Emphasis supplied.)

No inquiry was made of McCeney and Hooper in March 1961 as to any exchange of $1,000 bills for twenties. This was because it was not until the following year that information first reached the government of such an exchange. As a result of this information, Marzo in September 1962 questioned McCeney and Hooper about it, but they did not recall changing the thirty-five $1,000 bills into twenties. However, this was more than three and one-half years after the date the exchange allegedly took place, and one and one-half years after the time (March 1961) when inquiry was first made of McCeney and Hooper about the cashing of the Union check. Furthermore, the Bank had no records on the exchange of bills to which the Bank officers could refer to revive past recollection or which could corroborate or disprove Ashby's testimony that he changed the $1,000 bills for twenties.[12]

The record is replete with recollection failures of the two bank officers. At the habeas corpus hearing, McCeney failed to recall the March 1961 visit of the Labor Department investigators who questioned him about the Union check transaction of February 13, 1959. "I don't recall it," "I don't deny it, I just don't remember it," he said.[13] He did not recall the visit of these investigators to him in September of 1962. "I don't deny it, I don't recall it," he said.[14] Asked if it would refresh his recollection of that visit that the investigators inquired about the changing of $1,000 bills for bills of smaller denomination, McCeney answered, "No."[15] Asked if he remembered these investigators inquiring of him about Olson phoning him on February 13, 1959 prior to the cashing of the $35,000 Union check, McCeney answered, "I don't recall it, No."[16] Questioned as to whether he remembered being asked by the investigators to supply them with a copy of Hooper's teller sheet of February 13, 1959 McCeney answered, "I may have, I don't recall it."[17] When asked whether he remembered giving a signed statement to the investigators, McCeney answered, "I don't recall it, I may have done it."[18] When asked if he recalled signing such a statement, McCeney said, "I don't recall it, I may have signed the statement."[19] Upon McCeney's undated written statement being exhibited to him, he said it was his statement but when asked to state the year he made it, he said, "I don't recall whether it was '61, '60, or what it was."[20]

It is to be noted that Hooper in his testimony at the habeas corpus hearing said that he "never received the $35,000, ever, from *Mr. Olson.*"[21] (Emphasis supplied.) No one at Levin's trial testified that Olson exchanged the $1,000 bills. The evidence was that *Ashby* did, and Hooper did not even know Ashby.[22] Ashby was not asked at Levin's trial for the name of the teller who gave him $20

---

12. Ibid, p. 70.

13. Ibid, pp. 158, 159.

14. Ibid, pp. 159, 160.

15. Ibid, p. 160.

16. Ibid, p. 160.

17. Ibid, p. 160.

18. Ibid, p. 161. This statement is the second "piece of evidence" referred to by the Court of Appeals and hereinabove quoted.

19. Ibid, p. 162.

20. Ibid, pp. 163–164.

21. Ibid, p. 70.

22. Government's Exhibit No. 3, p. 15 (Hooper's testimony before the Grand Jury).

bills for the $1,000 bills. McCeney was not a teller, and Ashby could have gone to several tellers other than Hooper.[23] The exchange, according to Ashby, was made about noon, and at that time Hooper may have been at lunch.[24]

One significant failure of recollection on Hooper's part concerned his teller settlement sheet for February 13, 1959.[25] The main thrust of Levin's amendment to his habeas corpus petition was that this teller settlement sheet was obtained and suppressed by the government prosecutor. Prior to the return of the indictment, the government investigators had tried to obtain from McCeney and Hooper a copy of the mentioned settlement sheet, and were informed that being an old record, it had been destroyed. Yet, Hooper, *failing to remember this,* made a searching examination in court of copies of records handed to him by Levin's counsel (which had been obtained from the prosecutor), and not finding his teller settlement sheet for February 13, 1959, Hooper said, "it isn't here," and "I don't know why that wasn't here, but it isn't." [26]

Hooper testified also that when he was before the Grand Jury on August 3, 1961, he was asked about the changing of the thirty-five $1,000 bills for $20 bills.[27] However, this was a misrecollection as the transcript of his testimony before the Grand Jury shows that nothing was asked him about such exchange. Government's Exhibit No. 3. Hooper further testified that in response to a subpoena he produced certain records before the Grand Jury and gave them to the prosecutor.[28] This, too, was a misrecollection.[29] The only records the government had were copies obtained by the Labor Department investigators, but Hooper's memory failed him completely as to his contacts with the investigators.

The failures of recollection on the part of Hooper were numerous. The instances mentioned herein of such failures are not exhaustive.

### A Footnote of The Court of Appeals and The Conclusions of The Bank Officers

The Court of Appeals in footnote 15 of 363 F.2d at p. 292 states: "Hooper also testified that the normal procedures of the bank would have been violated if another teller had made the exchange without [Hooper's] knowledge" (meaning the exchange of $1,000 bills for $20 bills). Apparently this is a misconception of the testimony.

The phrase "normal procedure" was introduced by Levin's counsel in putting a question to Hooper. Hooper began his answer by repeating counsel's words, "The normal procedure," and then broke off to say: "the *chances* are they would have come to me to make the exchange because I had the bulk of the money at that time." (Emphasis supplied.) There was no evidence that it was the normal procedure for a customer desiring to obtain small bills for large bills to go to Hooper to make the exchange. This Bank had other tellers and each began his day with around $30,000 in cash and this would be increased during the day by his cash receipts and decreased, of course, by his outgoing cash.[30] The evidence was that any teller with the requisite currency could have made the exchange here involved, or if he did not have enough bills of the desired small denomination he could have obtained bills from a fellow teller or tellers so as to

---

23. Transcript, Habeas Corpus No. 95–65, p. 63.

24. Ibid, p. 85.

25. A teller's settlement sheet is a balance sheet showing the amount of cash the teller started the day with, the amount of cash he thereafter took in on that day, and the cash he paid out on the same day, including an itemization of the currency and silver.

26. Transcript, Habeas Corpus No. 95–65, p. 60. See also pp. 88–89.

27. Ibid, p. 106.

28. Ibid, pp. 54, 55.

29. Ibid, p. 200. See also Government's Exhibit No. 3.

30. Ibid, p. 60.

make up the number required by the customer. There was also evidence that any teller could have had a build-up (increase in cash receipts) sufficient to meet Ashby's request for $35,000 in $20 bills.

While there was evidence of a procedure of the Bank, it was to this effect: when tellers other than Hooper received $1,000 bills they were thereafter to channel the bills to Hooper as the keeper of the large bills, but this channeling was not required to be done immediately upon receipt of such bills. It might be done the following day. What Hooper said about the $35,000 in $1,000 bills was that he did not recall receiving them in *one group* on February 13, 1959. They could have gone, so he said, to "several windows" but whether they did or did not, he did not know.[31] When asked if he would have known if the thirty-five $1,000 bills were returned on the same day the Union's check was cashed Hooper said:

> Well, the *chances* are, I would, because the *chances* are it would come back to me or Mr. McCeney to exchange them, and if he didn't he could have gone to several other tellers but l have no knowledge of him doing that. (Emphasis supplied.) [32]

Hooper was asked if it was a matter of "deduction" on his part that if the thirty-five $1,000 bills were returned it would probably have come through him and if it had come through him he probably would have remembered. To this he replied, "That is right." [33] McCeney's conclusion that the thirty-five $1,000 bills were not returned for exchange was based, so he said, not on personal knowledge but "just hearsay in talking it over * * *, because I don't handle the currency." [34]

### The Conclusions of the District Court

If, as indicated by the Court of Appeals, significance attaches to the fact that neither of two Bank officers remembered exchanging the $1,000 bills for twenties but did recall the cashing of the Union check, such significance dwindles to the vanishing point in light of (1) the failure of the officers to remember the cashing of the Union check two years after the event when they were first asked about it; (2) the reconstruction or reviving of their recollections in this regard from bank records; (3) the time lapse of one and one-half years between inquiry of the officers as to the cashing of the check and inquiry of them as to the exchange of the bills; (4) the fact that this second inquiry was made nearly four years after the event in question; (5) the lack of bank records to disprove the exchange of the $1,000 bills for smaller bills; (6) the possibility that one of the several tellers other than Hooper exchanged the thirty-five $1,000 bills into $20 bills for Ashby; (7) the fact that Hooper did not know Ashby; (8) the fact that two witnesses—Ashby and Landriscina—testified unequivocally that the $1,000 bills were exchanged for $20 bills; and (9) the obvious memory deficit of McCeney and Hooper.

By its order of December 23, 1965 the Court of Appeals directed this court to determine "whether the government was negligent" in not having disclosed to the defense "at or before trial certain information in its possession which had some bearing on the case," and in the event of a finding of negligence to grant the writ of habeas corpus. This certain information is identified in the majority opinion of May 19, 1966 as (1) the drawing by the Bank on February 13, 1959 of a check on the Riggs Bank to replenish its supply of $1,000 bills, and (2) the statement of McCeney heretofore set out which contains the assertions already discussed about the nonrecollection of McCeney and Hooper as to exchanging the bills. Neither McCeney nor Hooper was a witness at Lev-

---

31. Ibid, p. 60.
32. Ibid, p. 63.
33. Ibid, p. 71.
34. Ibid, p. 136.

in's trial. This court finds that the information in question was not sufficiently probative or material to require disclosure to the defense, and that its nondisclosure by the government was not negligent. It was, when boiled down, only a matter of passive nonnegligent nondisclosure of a nonrecollection about an event almost four years past by persons who were available to the defense.

The other question the District Court has been directed to answer is whether the jury might have been led to entertain a reasonable doubt about Levin's guilt had the defense been able to show that McCeney and Hooper did not remember changing the $1,000 bills into smaller ones. In light of the "corroborating circumstances which bear out the Government's case,"[35] this court does not believe that the jury might have been led to entertain a reasonable doubt of Levin's guilt from the mere nonrecollection of McCeney and Hooper as to an event about which no inquiry was made of them until almost four years after the event. Accordingly, the answer of this court to the mentioned question is no.

In reading the majority opinion, it appears that the Court is suggesting that there might have been negligent nondisclosure in the instant case. The District Court finds that the nondisclosure involved falls short of negligence, and that the evidence in question was neither significant nor material.

Finally, this Court has considered the cases cited by the majority, all of which involve evidence which was either deliberately suppressed, entirely within the control of the State, or vital to the question of defense. Although these cases are excellent for the principles they represent, the case at bar does not fall within their orbit.

The petition of Levin for habeas corpus or alternatively for a new trial will be in all respects denied. This memorandum is to serve as the findings of fact and the conclusions of law of this Court. There is also included herein by reference the findings and conclusions heretofore made herein as reported in 249 F.Supp. 225. An appropriate proposed order is to be submitted by counsel for the respondent.

---

35. Levin v. United States, 119 U.S.App.D.C. 156, 338 F.2d 265, 267 (1964).