**Milton M. LEVIN, Appellant,**

v.

**Ramsey CLARK, Attorney General of the United States, Appellee.**

No. 20682.

United States Court of Appeals
District of Columbia Circuit.

Argued April 20, 1967.

Decided Nov. 15, 1967.

Petition for Rehearing En Banc Denied Dec. 16, 1968.

Burger, Circuit Judge, dissented.

---

Mr. Thurman Arnold, Washington, D. C., for appellant.

Mr. Theodore Wieseman, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Oscar Altshuler, Asst. U. S. Attys., were on the brief, for appellee.

Mr. James V. Siena, Washington, D. C., filed a brief on behalf of the National Capital Area Civil Liberties Union, as amicus curiae.

Before BAZELON, Chief Judge, EDGERTON, Senior Circuit Judge and BURGER, Circuit Judge.

BAZELON, Chief Judge.

After we affirmed Levin's grand larceny conviction,[1] he filed a petition for habeas corpus alleging that the prosecutor did not reveal evidence which would have been helpful. The District Court denied the petition, but we reversed and remanded so that the District Court could determine whether "the government failed to disclose evidence which * * * might have led the jury to entertain a reasonable doubt about appellant's guilt. Such a failure may be classified as negligence."[2] Levin is now appealing from the District Court's finding, on remand, that the evidence would not have led the jury to doubt his guilt.[3]

The prosecutor's constitutional duty to reveal evidence to the defendant was recognized in Mooney v. Holohan[4] and Pyle v. State of Kansas.[5] In Pyle, the Supreme Court said:

Petitioner's papers * * * set forth allegations that his imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him. These allegations sufficiently

1. Levin v. United States, 119 U.S.App. D.C. 156, 338 F.2d 265 (1964), cert. denied 379 U.S. 999, 85 S.Ct. 719, 13 L. Ed.2d 701 (1965).

2. Levin v. Katzenbach, 124 U.S.App.D.C. 158, 162, 363 F.2d 287, 291 (1966).

3. Levin v. Katzenbach, 262 F.Supp. 951 (1966).

4. 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

5. 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942).

charge a deprivation of rights guaranteed by the Federal Constitution, and, if proven, would entitle petitioner to release from his present custody.[6]

From these cases two lines of decision emerged. The first line involved cases in which the prosecutor suborned perjury or knowingly used perjured testimony at trial.[7] The rationale of these cases seems to have been that convictions must not be obtained through prosecutorial misconduct which violates civilized notions of fairness and thereby taints the entire criminal process. Lawless law enforcement should not be tolerated.[8]

The second line of decisions, which involved the duty to reveal evidence, had the same beginning as the first. In early cases, the suppression was so clearly unfair that it tainted the criminal process as much as if the prosecutor had suborned perjury.

> The methods employed by the prosecution * * * [represent] as shocking a situation as ever before presented before this court. A society cannot suppress lawlessness by an accused through the means of lawlessness of the prosecution. A society cannot inspire respect for the law by withholding its protection from those accused of crimes.[9]

Soon, however, the courts began to recognize that even negligent suppression, though it was not "shocking" or "lawless," could violate the constitution.[10] In Brady v. State of Maryland.[11] the Supreme Court confirmed this development.

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution.*[12]

■ As the focus of the cases shifted away from the prosecutor's misconduct, of necessity the constitutional rationale changed also. If the prosecutor acted in good faith and was merely negligent, he did not taint the criminal process. The new rationale focused not on misconduct of the prosecutor but on harm to the defendant. The Government's facilities for discovering evidence are usually far superior to the defendant's. This imbalance is a weakness in our adversary system which increases the possibility of erroneous convictions. When the Government aggravates the imbalance by failing to reveal evidence which would be helpful to the defendant the constitution has been violated.[13] The concern is not that law enforcers are breaking the

---

6. 317 U.S. at 215–216, 63 S.Ct. at 178.

7. Alcorta v. State of Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957), Napue v. State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

8. People v. Savvides, 1 N.Y.2d 554, 556–557, 154 N.Y.S.2d 885, 887, 136 N.E.2d 853, 854 (1956) ; Note, The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant, 74 YALE L.J. 136, 137–139 (1964). The dissenting judge has already indicated agreement with our analysis of this line of cases.
   Presentation of perjured testimony and deliberate suppression of evidence are types of conduct which not only prejudice the defendant but also violate the law, the basic duty of the prosecutor as an officer of the Court, and the very integrity of the judicial process. Such conduct is impermissible. As a result, a showing that the prosecution knowingly suppressed revelant exculpatory

evidence automatically entitles the defendant to a new trial, with little or no showing of prejudice. Levin v. Katzenbach, 124 U.S.App.D.C. at 165, 363 F.2d at 294 (dissenting opinion).

9. United States ex rel. Montgomery v. Ragan, 86 F.Supp. 382, 387 (N.D.Ill. 1949).

10. United States ex rel. Thompson v. Dye, 221 F.2d 763 (3d Cir. 1955), Application of Kapatos, 208 F.Supp. 883 (S.D.N.Y. 1962), Smallwood v. Warden, 205 F. Supp. 325 (D.Md.1962). Note, *supra* note 8 at 139–142.

11. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963).

12. 373 U.S. at 87, 83 S.Ct. at 1196 (emphasis added).

13. The dissenting judge has indicated agreement with this principle.
   The genesis, the basic rationale of the duty of disclosure, placed only on

**1212**

law but that innocent people may be convicted.

■ The question is what kinds of evidence must the prosecutor reveal? Various courts have talked about "favorable" evidence,[14] "material" evidence,[15] "pertinent facts relating to [the] defense,"[16] "information impinging on a vital area in [the] defense,"[17] evidence vital "to the accused persons in planning and conducting their defense,"[18] and "evidence that may reasonably be considered admissible and useful to the defense. When there is substantial room for doubt, the prosecution is not to decide for the court what is admissible or for the defense what is useful."[19] Without excluding any of these relevant considerations, in the present case we focused upon the ultimate possibility of harm to the defendant—the possibility of erroneous conviction—and we stated the standard in terms of whether the evidence "might have led the jury to entertain a reasonable doubt about [defendant's] guilt."[20]

■ This standard requires speculation because there is no sure way to know how the jury would have viewed any particular piece of evidence. Nor is it possible to know whether revelation of the evidence would have changed the configuration of the trial—whether defense counsel's preparation would have been different had he known about the evidence, whether new defenses would have been added, whether the emphasis of the old defenses would have shifted.[21] Because the standard requires this kind of speculation we cannot apply it harshly or dogmatically. In Griffin v. United States,[22] the Supreme Court directed us to consider "whether it would not be too dogmatic, on the basis of mere speculation, for any court to conclude that the jury would not have attached significance to the evidence favorable to the defendant had the evidence been before it."[23] We think it would be too dogmatic here.[24]

the prosecution in criminal cases, lies in the belief that giving criminal defendants counsel and the opportunity to call witnesses has not completely eliminated the reasons which led the common law, before these protections were provided, to require that the prosecutor present in court all evidence about an alleged crime, whether it helped his case or not.

The presumed—and ordinarily well founded—superiority of the prosecution's facilities for fact-gathering constitutes the basis for the duty to disc'ose exculpatory evidence and for the enforcement of it by setting aside co' victions secured in part because of its violation. Levin v. Katzenbach, 124 U.S. App.D.C. at 165, 363 F.2d at 294 (dissenting opinion).

See also Note supra note 8 at 142–145.

14. Pyle v. State of Kansas, 317 U.S. at 216, 63 S.Ct. 177, 87 L.Ed. 214.

15. United States ex rel. Thompson v. Dye, 221 F.2d at 765.

16. Curran v. State of Delaware, 259 F. 2d 707, 711 (3d Cir. 1958).

17. United States ex rel. Butler v. Maroney, 319 F.2d 622, 627 (3d Cir. 1963).

18. Ashley v. State of Texas, 319 F.2d 80, 85 (5th Cir. 1963).

19. Griffin v. United States, 87 U.S.App. D.C. 172, 175, 183 F.2d 990, 993 (1950).

20. Levin v. Katzenbach, 124 U.S.App.D. C. at 162, 363 F.2d at 291.

21. Cf. Ashley v. State of Texas, supra note 18; United States ex rel. Butler v. Maroney, supra note 17; Note, supra note 8 at 145–147.

22. 336 U.S. 704, 69 S.Ct. 814, 93 L.Ed. 993 (1949).

23. 336 U.S. at 709, 69 S.Ct. at 816.

24. The Government suggests that the trial court's ruling must be "clearly erroneous" before we reverse. Although, for reasons stated below, we think the trial court's error is clear, we do not think the "clearly erroneous" standard is applicable. As we said in Jackson v. United States, 122 U.S.App.D.C. 324, 326, 353 F.2d 862, 864 (1965), we said "in reviewing facts * * * courts apply the 'clearly erroneous' standard * * *." Here, we are not reviewing facts. There is no dispute about what evidence the prosecutor failed to reveal. The only question is what legal conclusion follows from this failure. We must review the trial court's legal conclusion in the same way we review any other legal conclusion of a trial court.

Levin was convicted on one count of grand larceny. The indictment charged that on or about February 13, 1959, he stole $35,000 from the Bakery and Confectionery Workers International Union of America. The money was supposed to have been embezzled by various members of the Union and given to Levin on or about the 13th of February so that he could fix the pending perjury trial of James Cross, the President of the Union. Levin was supposed to have taken the money without performing the services.

The Government's brief describes a strong case against Levin. James Landriscina, Vice President of the Union, provided most of the background. He testified that he met Levin in January, 1959. Levin said he could fix Cross's case for $35,000 or $40,000. Landriscina arranged for Levin to meet Cross in Washington. To pay for the trip, Levin received a check for $600. Landriscina was present at two meetings between Levin and Cross at which the price for the fix was set at $35,000. Levin also requested that he be hired by the Union as general counsel. After some dispute, Cross agreed to hire Levin as a lobbyist for $17,500 a year.

During both days of the Cross trial, February 16 and 17, Landriscina saw Levin standing around the corner from the courtroom. After the trial, Levin submitted a bill for "Professional services rendered through February 28, 1959, $17,500," but he received no money. On April 8, 1959, Landriscina made partial payment of $2,500 from the funds of his local union. Ultimately the Union did pay Levin more than $17,500 during 1959. The Government exhibits documented payments to Levin in 1959 of $600, $2,500, $2,500 and $15,000. Also, it was shown that Levin performed almost no services for the Union in 1959.

The Government's evidence outlined above may have shown that Levin was en-gaged in some shady dealings with the Union. But he was not tried for, or convicted of, fixing or attempting to fix a perjury case. Nor was he convicted of fraudulently representing himself to the Union as a lobbyist. He was convicted of stealing $35,000 from the Union on or about February 13, 1959. The evidence outlined above serves only to set the background and show the circumstances of the alleged larceny.

Landriscina was the only witness to the larceny itself. He gave a very detailed account of the transaction. He testified to the following: On Tuesday, February 10, Levin asked Landriscina for $10,000. Levin said he needed the money to pay some jurors and court attendants. On Thursday, February 12, Landriscina received an envelope with $1,000 bills from Olson, Secretary-Treasurer of the Union, and at 11:00 a. m. handed it to Levin on a park bench. At 12:00 Levin met Landriscina again and said that the $1,000 bills must be changed into smaller bills. Landriscina took the $1,000 bills, returned to his office, had someone exchange the $1,000 bills for smaller bills, and returned the smaller bills to Levin. The next day, Friday, February 13, Landriscina gave Lavin $25,000, the balance of the promised $35,000, in small bills.

Peter Olson and Richard Ashby told a different story. Olson testified that on Friday, February 13, he cashed a $35,000 check at the National Savings and Trust Company and received the money in $1,000 bills.[25] At 10:45 a. m. he gave ten $1,000 bills to Landriscina.

It was Ashby who supposedly exchanged the $1,000 bills for $20 bills at the bank. He testified that he was in the Union's office on Friday, February 13, when Olson returned from the bank with thirty-five $1,000 bills.[26] He saw Olson give ten of the bills to Landriscina. Olson left the other twenty-five $1,000 bills with Ashby. Later Landriscina returned

---

**25.** Olson's testimony contradicted Landriscina's testimony that he made the first payment to Levin on February 12. The Union's cancelled check corroborated Olson's testimony.

**26.** Ashby's testimony about the date of this transaction also contradicted Landriscina's testimony.

to the Union's office and asked Ashby to exchange the entire $35,000. Ashby went to the bank, dealt with a Mr. McCeney,[27] exchanged the bills, and returned in a few minutes.

The two pieces of evidence which the Government failed to reveal bear directly upon this complicated transaction. The first was a check for $35,000, dated February 13, 1959, drawn on the Riggs National Bank by the National Savings & Trust Co. to enable National Savings to replace the thirty-five $1,000 bills which Olson withdrew. The argument is that it would not have been necessary to replenish the supply of $1,000 bills if they were returned. But, as we pointed out in our previous opinion, the bank's practice was to replenish the supply as soon as possible after a withdrawal, so National's check on Riggs might have been issued even if the $1,000 bills were afterwards returned.

■ The second piece of evidence is more significant. The Government had in its possession a statement by Mr. McCeney, the bank officer with whom Ashby dealt when he exchanged the $1,000 bills.

I hereby recall Mr. Olson coming in with a $35,000 check, dated February 13, 1959 to be cashed but I do not recall a telephone call from Mr. Olson to arrange the cashing of this check. Mr. Olson came in and I took him to Mr. Hooper, who, at that time, was running one of the savings windows and handling the large cash, to cash this check which he did in thousand dollar bills. I do not recall Mr. Ashby coming in to change the thousand dollar bills to smaller ones. If he did I would have taken him back to Mr. Hooper because he was handling the large bills. Mr. Hooper says he does not recall cashing this money into smaller bills that day.

Ashby specifically testified before the Grand Jury that he dealt with Mr. McCeney when he exchanged the bills. Yet McCeney said that he did not remember the exchange, although he did remember Olson's cashing a $35,000 check earlier that same day.[28] Also, McCeney claimed that if he had been asked to exchange thirty-five $1,000 bills he would have gone directly to Mr. Hooper. According to the statement which was not revealed, Hooper did not remember cashing the money into smaller bills either.[29]

---

27. This fact came out during Ashby's testimony before the Grand Jury.

28. The dissent states that McCeney and Hooper did not remember cashing the $35,000 check until they consulted bank records. But the evidence on this point is contradictory; at the habeas hearing McCeney and Hooper recalled details of the transaction which would not be contained in records.

    McCeney testified: Well, Mr. Olsen came into the bank and I contacted him there in the office and took him over to Mr. Hooper and he wanted large bills, I asked him how he wished the money and he said $1,000 bills and I took him to Mr. Hooper because he was handling the large denomination of bills at that time. * * * H.Tr. 131.

    Hooper testified: Mr. Olson contacted one of our officers, Assistant Treasurer, Mr. McCeney, and asked him to cash this $35,000 check, which I had the thousand dollars bills [sic]. H.Tr. 52.

    The witnesses seem to be describing a specific incident and not, as the dissent as-

serts, "established bank procedures concerning large bill transactions."

    In any event, the bank officials would be far more likely to remember exchanging thirty-five $1,000 bills than cashing a $35,000 check, since the former transaction is "very unusual" while the latter is not. Compare H.Tr. 63 with Government's exhibit No. 3, pages 6, 7 quoted at 262 F.Supp. at 958.

29. Although defense counsel also interviewed McCeney prior to trial, the interview was an informal one, and there is nothing in the record to suggest that the prosecutor knew about it. Moreover, even if the prosecutor did know about the interview, he had no reason to believe that, at this juncture, defense counsel was aware of the purported exchange of bills. (In fact, defense counsel did not know about the purported exchange when he interviewed McCeney.) Thus, the prosecutor had no reason to believe that the defense interview with McCeney touched on the crucial points covered in McCeney's statement to the Government.

If the jury had known of McCeney's statement and had taken it to indicate that there was no exchange into smaller bills, then Landriscina's description of the transaction would have fallen and with it the heart of the Government's case. Of course the jury might have disbelieved McCeney, or it might have decided that the exchange took place even though McCeney and Hooper did not remember it.[30] Or the jury might have convicted on the basis of the circumstantial evidence even though it believed that the exchange of bills and the transaction surrounding that exchange had not occurred. Yet it is clearly within the realm of possibility that the jury would have "attached significance" [31] to McCeney's statement.[32]

We would be required to reverse, then, even if the statement's only significance were in the way a jury might have viewed it. However, the statement has another importance. With knowledge of McCeney's statement, defense counsel certainly would have probed deeper into what was the central aspect of the Government's case. For example, with some investigation, reconstruction of events, and discussions with Hooper and McCeney, defense counsel might have been able to transform their inability to remember the transaction into a positive statement that there was no exchange of bills.

In fact, at the habeas corpus hearing after the trial Hooper testified that to the best of his knowledge he had not exchanged the bills.

> Mr. Olson contacted one of our officers, Assistant Treasurer, Mr. McCeney, and asked him to cash this $35,-000 check, which I had the thousand dollar bills. We usually maintained a certain level, say around $50,000 in thousand dollar bills for these special

requests. So I cashed this check and that is the last I saw of the transaction. Now, to my knowledge, that was the end of the transaction as far as I was concerned.

Apparently Olson's visit to the bank was the end of the transaction as far as McCeney was concerned also. Before the habeas corpus hearing he told petitioner's counsel that

> To the best of [my] knowledge, these $1000 bills were never returned that day (or any reasonable time thereafter) for exchange into currency of smaller denominations.

At the hearing McCeney confirmed his statement

> [T]hat is the knowledge that I have of it, that they never, they were not returned shortly or at any later date, the $1000 bills.

This testimony would have had great significance if it were brought out at trial because Ashby said he dealt with McCeney, and McCeney said if anyone had come to him to make the exchange, he would have gone directly to Hooper. So both McCeney and Hooper would have known of the exchange had it occurred. Of course, their subsequent testimony was not known to the prosecutor before trial, and we do not hold him responsible for not discovering and revealing it. However, its fortuitous discovery at the habeas corpus hearing adds credence to our speculation that, if defense counsel knew of McCeney's pre-trial statement, the course of the trial might have been quite different.

Reversed for a new trial.

BURGER, Circuit Judge (dissenting):

Again we have a holding of this Court reversing a conviction which was not only

---

30. McCeney's and Hooper's memory had been proved faulty in other matters. Levin v. Katzenbach, 262 F.Supp. at 958–959.

31. Griffin v. United States, *supra* note 23 at 709.

32. In part, the District Court's ruling below was based on the fact that the exchange could have taken place without Hooper's or McCeney's knowledge. This ruling apparently ignores Ashby's testimony before the Grand Jury that he dealt with McCeney when he exchanged the bills.

fairly obtained in 1963 but affirmed on direct appeal to this Court, with certiorari denied by the Supreme Court, Levin v. United States, 119 U.S.App.D.C. 156, 338 F.2d 265 (1964), cert. denied 379 U.S. 999, 85 S.Ct. 719, 13 L.Ed.2d 701 (1965). This is but another of the long line of cases demonstrating this Court's chronic aversion to finality in criminal cases. This holding is a grave abuse of the Great Writ of habeas corpus which was intended to correct injustice, not frustrate justice; it lays down an unworkable and totally specious requirement.

After failing to persuade this Court and the Supreme Court to disturb his conviction, Appellant sought release on a petition for habeas corpus claiming "newly discovered evidence," and arguing the Government had knowingly used perjured testimony; later he changed his petition to claim that the Government had concealed certain evidence. Both these claims were totally without basis and the majority agrees that this is so; the first claim was abandoned and this division of this Court rejected the second claim.[1] The majority now hints that perhaps we did not reject the second contention when we remanded the habeas corpus petition to the District Court, but even a cursory reading of our opinion, Levin v. Katzenbach, 124 U.S.App.D.C. 158, 162, 363 F.2d 287, 291 (1966), will show that at most the remand found only a *possibility* that the Government may have "negligently" failed to disclose what had been stated by a potential witness interviewed by both sides.

This Court's remand to the District Court was for two purposes: *first,* to determine whether the Government was negligent in not advising the defense that a bank officer had said he could not remember the exchange of large bills into $20.00 bills and *second,* if there was negligence, to determine whether this non-recall "might have led the jury to entertain a reasonable doubt about appellant's guilt."

After a hearing and extended consideration on remand the trial judge found as a fact that the Government had not been negligent and that even had the jury been told of the bank officer's non-recall of the events, it would not have affected the result. Rule 52, FED.R.CIV.P. limits our review narrowly to determining whether the District Court findings were clearly erroneous.

Before reaching analysis of what was done and what the majority now does, it is important to make clear what is *not* in dispute in this case. The prosecutor's duty to disclose evidence favorable to the defense was defined by the Supreme Court in Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), but the issues here presented are not governed by that holding.[2]

But that rule is not the issue in this case, notwithstanding the belated and the tortured effort of the majority to make it appear so. What is involved is this: in preparing the case for trial each side interviewed one McCeney, a bank officer, concerning the $35,000 check drawn on union funds; this was the $35,000 paid

---

1. Indeed, the remand order recited "the prosecution, *no doubt in complete good faith, did not disclose to the defense* at or before trial" the fact that a bank officer stated he "could not recall" changing large bills into $20 denominations. Levin v. Katzenbach, 124 U.S.App.D.C. 158, 159, 363 F.2d 287, 288 (1966) (emphasis added). Surely this made clear that no "suppression" or "concealment" of *evidence* was involved.

2. *Brady* decided that "upon request" the prosecution must furnish evidence favor-

able to the accused, 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. I would assume that where the government has positive exculpatory evidence which plainly would constitute a defense, the government has a duty to tender it without a request. But the majority here stretches the sound *Brady* concept to cover peripheral material which by no stretch of imagination could have been regarded as "evidence." It is for this reason the majority must spin out its fanciful theory of government "negligence."

to Levin on his fraudulent claim that he could "fix" a case against one James G. Cross, then under indictment for embezzlement of union funds.

In light of this factual background the not-very-subtle quotation in the majority opinion from other cases which are inapposite, using such inflammatory terms as "lawless" and "shocking" to describe conduct of a prosecutor, is an affront to the facts of this case. That these lurid allusions purport to be part of tracing the development of the law of the subject is a very thin excuse for this tactic and I suggest is a poorly veiled device to hint darkly at some nefarious act of Government which cannot be supported by reference to *facts*. The remand decision suggested only that the Government *may have* negligently failed to disclose information it had received; and even that claim rested on the fragile reed of an assumption that the Government had a duty to say in effect:

> Now look, Mr. Defense Counsel, we interviewed Mr. McCeney and here is what he said to us: He remembers cashing the $35,000 check but cannot recall changing the bills into small denominations. We want to make sure he gives you the same information he gave us.

To apply any such remarkable standard, the Government must first surely have some reason to believe that the information of non-recall is relevant in some way so that it rises to the level of "evidence." To recite this proposition, which is simply to apply the majority's thesis, is to demonstrate that it has no basis in the realities of litigation.

It is, of course, too elementary to require citation of authority that there are two predicates of negligence: first, the existence of a *duty* and second, failure to meet that duty. Can it be possible—rationally possible—that the prosecutor has a *duty* to monitor or guide and oversee the defense counsel's preparation and conduct of his case to the extent of requiring an exchange of information on a statement of non-recall derived from an interview with a common witness? Can it be that defense lawyers want or expect this kind of "Big Brother" treatment so long as they know of the existence and whereabouts of the witness and have access to him, as the defense did here? Even were civil pre-trial processes available, it is most unlikely that the bank officer's non-recall would have been noted.

Having previously registered my dissent to the nebulous and novel "negligence" concept relied on by the majority, but being bound by it as the law of this case, I shall try to demonstrate that, even assuming the validity of the wrongly conceived and undefined law-for-this-case guidelines of the majority, the District Court was not "clearly erroneous" in finding that the "new evidence" in question would not "have led the jury to entertain a reasonable doubt about Appellant's guilt."

To an utterly absurd legal standard of prosecutorial negligence-without-duty, the majority now applies a review standard which is ridiculous and anticlimatical in the extreme. The second aspect of the remand was to have the District Judge, after passing on the "negligence" aspect, decide whether the alleged newly discovered detail would have had an impact on the jury had the defense called McCeney and developed his lack of recollection. We must remember this is a case tried more than three years ago on events now nine years in the past.

Having sent the case back for a *factual* determination the majority—perhaps because they do not relish the result—now makes the discovery that this is not a *factual* issue after all but a *legal* matter. I suggest this is a transparent device to avoid the impossible task of demonstrating that the District Judge was "clearly erroneous" under Rule 52. In a most remarkable piece of judicial legerdemain, what was once a *factual* issue for the trial judge as fact trier, now emerges as a *legal* question for appellate judges! Of course, when this case is tried again—as

it must—the issue will again be emeshed in the jury's fact-finding deliberations.

Just how a jury could have been "influenced," as the majority now decides, by a piece of peripheral non-recall "evidence" available to and brushed aside by defense counsel is left dangling in mid-air. The action of the majority, ignoring firmly established concepts of appellate review and the Federal Rules of Civil Procedure as well, demonstrates the wisdom of the historic limitations imposed on reviewing courts. It was to hold in check undisciplined judicial action by remotely situated appellate judges that these rules were framed, but those concepts are cast aside today even if only to make a Rule-for-Levin's-Case.

The District Judge, whose trial experience vastly exceeds that of all three members of this panel and who lived with this case for many days, observing witnesses and jurors alike, was the best, if not the only, person qualified to make the appraisal for which we remanded. Since that appraisal cannot be improved upon by paraphrasing, I quote:

If, as indicated by the Court of Appeals, significance attaches to the fact that neither of two Bank officers remembered exchanging the $1,000 bills for twenties but did recall the cashing of the Union check, such significance dwindles to the vanishing point in light of (1) the failure of the officers to remember the cashing of the Union check two years after the event when they were first asked about it; (2) the reconstruction or reviving of their recollections in this regard from bank records; (3) the time lapse of one and one-half years between inquiry of the officers as to the cashing of the check and inquiry of them as to the exchange of the bills; (4) the fact that this second inquiry was made nearly four years after the event in question; (5) the lack of bank records to disprove the exchange of the $1,000 bills for smaller bills; (6) the possibility that one of the several tellers other than Hooper exchanged the thirty-five $1,-000 bills into $20 bills for Ashby; (7)

the fact that Hooper did not know Ashby; (8) the fact that two witnesses—Ashby and Landriscina—testified unequivocally that the $1,000 bills were exchanged for $20 bills; and (9) the obvious memory deficit of McCeney and Hooper.

Levin v. Katzenbach, 262 F.Supp. 951, 960 (D.D.C.1966).

The Government case, presented to the jury in 1964, satisfied 12 jurors—beyond a reasonable doubt—that Levin told Cross and Landriscina, officers of the Bakery and Confectionery Workers' Union, that he could "fix" Cross' perjury trial at a cost of $35,000; that $35,000 was raised by Peter Olson, Secretary-Treasurer of the Union, by embezzling Union funds; that Landriscina delivered the money to Appellant in Washington and that Appellant kept the money; in short, the jury found that Levin's whole story was simply a confidence scheme concocted by him to bilk his victims out of $35,000.

A review of the evidence before the jury is called for by the majority's action since the central issue at Appellant's jury trial was whether Levin had received the $35,000. Landriscina testified that he gave Levin $10,000 at 11:00 o'clock on the morning of February 12, 1959, and $25,000 at 5:00 o'clock on the evening of Friday, February 13. Olson and his subordinate Ashby, disagreeing with Landriscina only in detail, also testified that they had given Landriscina the $35,000 in two installments—$10,000 on the morning of February 13 and $25,000 that same afternoon.

Although Landriscina's version as to the *date* of the $10,000 payment was contradicted by Ashby and Olson as to the particular day, the transaction *was corroborated by them in all other details*. Landriscina testified that he received from Olson an envelope containing ten $1000 bills and gave them to Levin at the first meeting. Shortly thereafter Landriscina said he was contacted by Levin, who reported that the "fellow who was to take care of the jury" would not ac-

cept bills of such large denominations. Landriscina then took the ten $1000 bills back to the Union office and arranged to have the money changed. He thereafter delivered $10,000 to Levin in smaller bills. Then, at the second meeting, he transferred the remaining $25,000 in small bills.

Olson testified that he cashed a $35,000 Union check on February 13 and gave Landriscina $10,000 in $1,000 bills to "fix the Cross trial." Ashby testified that he saw the exchange of bills and that Olson then instructed Ashby to give Landriscina the remaining $25,000 when he asked for it. Ashby confirmed that Landriscina returned and said Levin claimed the bills were unacceptable because they were too large. Ashby then took the entire $35,000 to the National Savings and Trust Company, changed the bills into twenties and gave Landriscina $10,000 and put the rest in the safe. Later the same afternoon, Landriscina returned for the $25,000 which he gave Levin later on February 13.

The Government also introduced the check which Olson cashed to obtain the $35,000, dated February 12; bank markings on it indicate that it was cashed on February 13 thus supporting the view of those who said the currency passed on the 13th. Both Landriscina and Olson agreed that, whatever the day, the $35,000 was paid to Levin in two installments.

Levin denied receiving any of the money and claimed that he could not have been involved at all because as a diligent observer of the Jewish Sabbath he would have been home on Long Island by sundown on February 13, the time fixed by two witnesses of the delivery of the second payment of $25,000. Levin's denial on this score was the essence of his defense.

Taking full advantage of the one-day confusion in dates in the Government's case, i. e., whether the first delivery of money took place on February 12 or February 13, Levin sought to show that Ashby and Olson were telling the truth about cashing the $35,000 since bank records on this were undisputed, but that Landriscina was lying and had kept the money for himself or passed it on to someone else. Defense counsel hinted repeatedly to the jury in his cross-examination of Landriscina and later in his argument, that Landriscina stood in line to become President of the Union if Cross were convicted of perjury, indicating that Landriscina had more to gain than the $35,-000 by not passing it on to Levin.[3] Levin also sought to impeach Landriscina by demonstrating his memory faults with respect to the events of February, 1959, including the fact that Landriscina had previously stated to Government investigators that the first delivery had been on February 9, and by showing that Landriscina had pled guilty to conspiracy to obstruct justice under another count of the same indictment on which Appellant was tried.[4]

Notwithstanding the great efforts of the defense to exploit the one-day discrepancy between the Landriscina and Olson-Ashby versions, the jury had little hesitancy about believing the essence of Landriscina's account of transferring the money to Levin. After an eight-day trial, the jury promptly found Levin guilty. The verdict indicates the jurors considered the mistake of one day—a variance of a kind found in most lawsuits—was a natural result of the passage of time; the verdict also shows the jury rejected the various efforts made to impeach prosecution evidence.

The new "evidence" which the majority professes to believe might have changed the jury verdict is a statement by Benjamin McCeney, Assistant Treasurer at the National Savings and Trust Company,

---

3. Levin admitted later receiving fees from Landriscina for lobbying on behalf of the union.

4. Judge Bazelon in his dissent from the original affirmance of Levin's conviction stated:

[Landriscina's] testimony was thus subject to impeachment and was in fact impeached. His testimony as to date and times was contradicted by other prosecution witnesses.

119 U.S.App.D.C. at 158, 338 F.2d at 277.

that while he remembered Olson cashing the $35,000 check, he did "not recall Mr. Ashby coming in to change the thousand dollar bills to smaller ones." It must be emphasized that this piece of supposed "new evidence" is not *evidence* in the sense that it tends to prove any fact but is really non-evidence. McCeney's statement was that he *did not remember* whether Ashby came in to exchange the bills; he did *not* say that he remembered that Ashby did not change the bills. It is simply a reflection of non-recall, made to Government investigators in September, 1962, three and one-half years after the transaction and long before the habeas corpus hearing on the "new evidence" claim.

It is inconceivable to me—as it was to the presiding trial judge—that this non-recall could now be said to have had any effect on the jury. A few reasons are immediately apparent:

(1) The jury could reasonably have concluded that it is not surprising that a bank officer of a large and busy bank could not remember changing some money three and one-half years after the event even with $1,000 bills involved.[5]

(2) The majority totally fails to give weight to the fact that Appellant's trial counsel, experienced in criminal matters, indicated that he did not regard McCeney's testimony as important when trial counsel testified at the habeas cor-

pus hearing. The attorney testified in the habeas corpus hearing that he had learned from the Cross trial, in advance of the Levin trial, that the large bills had been changed into smaller ones. He had previously spoken to McCeney to determine if there would be any records of the cashing of the $35,000 check and learned that they had not been retained. After learning of the exchange of bills at the Cross trial, the attorney testified: "I did not again go to the bank *because I had no reason to*. I had previously been told by two people that they had no records." The logical inference is that he was aware that the bank officers could not remember and that without records he would not be inclined to want their testimony. Apparently trial counsel believed that any non-recollection would not seem significant to his defense tactics or to the jury. In other words, we now reverse for a new trial because "evidence" was not available that would apparently not have been used if it were!

That Levin's trial counsel, when called at the habeas corpus hearing, believed that this so-called "evidence" would not have influenced the jury undoubtedly flows from the fact that the jury believed Landriscina's testimony that he gave the money to Levin despite the fact that Landriscina was contradicted as to the details and time by his own associates and documentary evidence, and de-

5. The majority seems to attach some significance to the fact that McCeney could remember cashing the $35,000 check but could not remember changing the bills. It was in March of 1961 that government investigators first asked McCeney and Hooper about cashing the $35,000 check; this was two years after the event. *They could not remember it.* When the investigators returned to the bank the next day, McCeney and Hooper did recall cashing the check; the evidence adduced at the habeas corpus hearing showed that they recalled cashing the check upon *consulting bank records.* McCeney was not asked about changing bills until September of 1962—a year and a half after being asked about cashing the check and three and a half years after the event. The Bank's records of large bill transac-

tions had been destroyed by that time. Is it any wonder, then, that three and one-half years after the event, the Bank officers could not remember the exchange when the only reason they could remember cashing the check two years after the event was that they had consulted their records? The majority's suggestion, therefore, that it is significant that McCeney remembered the cashing but not the exchange is baseless.

The majority in note 28 states that "at the habeas hearing McCeney and Hooper recalled details of the transaction which would not be contained in records." But the testimony which the majority relies upon is a description by bank officers of established bank procedures concerning large bill transactions. Of course, no records were needed to recall this.

spite the fact that he was impeached by his role in the criminal conspiracy and by his possible motives for not delivering the money. Can there be any rational basis to believe that the jury might have changed the verdict if they had heard a statement of non-recall from a subsidiary participant about a tangential detail when the other, more important considerations did not sway them?

(3) There is nothing whatever, except hindsight, to suggest that the defense would have made any use of McCeney's statement, and indeed I can hardly imagine that any experienced trial lawyer, such as Levin had, would have wanted to indicate to the jury the weakness of its case by calling McCeney as its witness only to have him say he "could not remember." [6] Moreover, the thrust of any defense utilization of McCeney's non-recall would have been to argue that the exchange of bills never occurred. But to demonstrate that, Appellant would have had to argue that not only was Landriscina lying, but also Olson and Ashby, since all three testified that the $1,000 bills had been exchanged for smaller denominations. As I pointed out in my first dissent, it is more difficult to persuade a jury that three men are lying than, as Levin attempted to do at trial, that one is.

I regret the occasion to dissent in these terms, except that it becomes necessary to demonstrate the glib but fallacious assumptions which underlie the majority's action. Even more I regret this Court's repeated actions which plainly tell prisoners, "jail-house" lawyers and the bar generally that if they can find a way to continue the warfare with society long enough they may finally reap the natural rewards of lost

evidence and fading memories. New trials, long after the events occurred, place enormous obstacles in the way of just results. It is on this very basis that courts dismiss indictments for lack of speedy trial. *Compare* Williams v. United States, 102 U.S.App.D.C. 51, 250 F.2d 19 (1957). Here the prosecution must now re-try a case concerning events of February, 1959, and by the time of the new trial nearly nine years will have elapsed. On this record, I feel fully warranted in charging the majority with another instance of appellate "nit picking." This kind of perversion of the judicial process has gravely hampered speedy and certain justice in this jurisdiction.

Before BAZELON, Chief Judge, DANAHER, BURGER, WRIGHT, McGOWAN, TAMM, LEVENTHAL and ROBINSON, Circuit Judges, in Chambers.

### ORDER

PER CURIAM.

On consideration of appellee's Petition for Rehearing, *En Banc*, and appellant's opposition thereto, it is

ORDERED by the Court, *En Banc*, that appellee's aforesaid petition is denied.

Circuit Judges DANAHER, BURGER and TAMM would grant appellee's petition for rehearing *en banc*.

A separate statement of Circuit Judge McGOWAN, concurred in by Circuit Judges LEVENTHAL and ROBINSON, as to why he voted against rehearing *en banc* is attached.

A separate statement of Circuit Judge WRIGHT as to why he voted against rehearing *en banc* is attached.

---

**6.** One other aspect of the majority opinion deserves comment. It is hinted that the statement of Hooper at the 1966 habeas corpus hearing—two years after the trial —is somehow relevant to whether the Government should have told the defense in 1964 of the McCeney statement. But the Government did not learn about that fact until the 1966 hearing. Can the Government be expected to give the de-

fense information it did not have at the time of trial? The majority's confusion is indicated by the statement in their first opinion that they "do not suggest that the government is required to * * * disclose all its evidence, however insignificant, to the defense," Levin v. Katzenbach, 124 U.S.App.D.C. 158, 162, 363 F.2d 287, 291 (1966), but they now act to the contrary.

A separate statement of Circuit Judge DANAHER as to why he voted for rehearing *en banc* is attached.

A separate statement of Circuit Judge BURGER as to why he voted for rehearing *en banc* is attached.

Separate Statement of Circuit Judge Mc-GOWAN, concurred in by Circuit Judges LEVENTHAL and ROBINSON, on Votes to Deny Rehearing En Banc

McGOWAN, Circuit Judge:

In voting to deny rehearing *en banc* in this case, I remain equally unpersuaded of the accuracy of (1) the dissenting judge's characterization of the information in question as "non-evidence", (2) the majority's generalization that there is a constitutional duty resting upon the prosecution to disclose voluntarily any and all "evidence which would be helpful to defendant", or (3) the Government's representation in its petition for rehearing *en banc* that the panel's decision gives it no alternative but to turn over to the defense its complete investigation file in every criminal case.

I do not think it is possible in any one case to write a definitive demarcation between the Federal Criminal Rules relating to discovery, on the one hand, and those particular situations where a fair trial may have been significantly blurred by the Government's failure to comply with a request for information. Judge Frankel, in a singularly perceptive, useful, and recent discussion of this problem, United States v. Gleason et al., 265 F. Supp. 880 (S.D.N.Y.1967), has said that, although "the dimensions of due process are not limited or fully defined by the Rules of Criminal Procedure * * * it makes obvious practical and doctrinal sense to consider the directly pertinent rules promulgated by the highest Court when appraising the meaning of the Constitution which is ultimately for that Court to expound." Dealing with a motion to compel disclosure by the Government of any evidence favorable to the defense, he said that "it seems safe to take as a starting point the proposition that the prosecution need not deliver up, either before or during trial, all that would be literally embraced" by such a demand. But he goes on to conclude that:

> It seems doubtful, however, that there should be a blanket rule postponing to the trial all disclosures of the type in question [that is to say, disclosures beyond the scope of the Federal Rules]. For example, where the prosecutor knows of witnesses potentially useful to the defense, does not intend to call such witnesses himself, and knows—or should reasonably be expected to suppose—that his knowledge is not shared by defense counsel, the information may come too late for effective preparation if it is not delivered until the case is on trial. [Citations omitted] Other kinds of instances will undoubtedly arise where the Government "has in its exclusive possession specific, concrete evidence" of a nature requiring pretrial disclosure to allow for full exploration and exploitation by the defense.

In other words, the prosecutor, like the rest of us, is going to have to learn how to live in the shadowy world between the Rules and the Fifth Amendment. I sympathize with his plight, but, contrary to the assumptions of his petition for rehearing, we cannot release him from it by a broad pronouncement in this or any other particular case. The panel decision may have been wrong, but we do not *en banc* every panel decision which might well have gone the other way. On the other hand, it may have been right. Its important characteristic for present purposes is not its individual rightness or wrongness, but whether it is simply one application of a general legal doctrine which existed before this case was decided and which, after that event, continues to exist in essentially the same form.

The following chronology of this prosecution will, I believe, be helpful in weighing the question of whether the decision

is so far out on its facts as to constitute a departure from the doctrinal channel. These facts (as to who knew what, and when) are essential in my appraisal of the need to consider this case *en banc*.

The alleged theft occurred in 1959. In March of 1961, the Government investigators went to the bank to inquire about the cashing of the union check which generated the bribe money. They were first told by Mr. McCeney, an Assistant Treasurer, only that transactions of the kind about which they were inquiring were normally handled by Mr. Hooper, an Assistant Head Teller. Hooper told them that he remembered nothing about the cashing of the check, but he apparently agreed to take a further look because, when the investigators came back the next day, he said that Olson had cashed a $35,000 check and received $1000 bills.

The matter was presented to the grand jury in June of 1962. It was in this proceeding, and by means of the testimony of Ashby, that the Government apparently first learned of the exchange of the $1000 bills into $20 bills. It recognized the significance of this testimony of its own witness, because it made an earnest effort to corroborate it. In September of 1962, its investigators went to the bank again where they interviewed McCeney. They asked him if he could confirm what had been said to the grand jury about the $20 bills; and they took from him on this occasion a written statement in which he said in substance that (1) he did not recall any exchange for smaller bills, (2) Hooper would, in any event, have handled it, and (3) Hooper had told him that he did not recall any such exchange. Further emphasizing the importance which the Government attached to this matter, particularly in the light of this initial failure to corroborate its own witness, the Assistant United States Attorney in charge of the prosecution telephoned McCeney promptly after he read the written statement brought back to him by his investigators. This telephone call was a seeming further effort to elicit some corroboration. It failed because McCeney apparently said in response to this inquiry that he would not say that it did not happen but that he could not remember any such thing.

Thus it was that the Government knew as of the fall of 1962 that its key witnesses were going to testify at the trial that the defendant had made them exchange the $1000 bills for $20 bills, but that the bank officials who allegedly effected this exchange could not corroborate this testimony. The Government could not have been unaware of the danger this involved to its case, particularly one of this kind where the jury would immediately recognize the prosecution witnesses as operating in an atmosphere where cash floating around is as likely to end up in someone else's pocket as in that of the defendant. If any shadow of doubt could be thrown on the testimony of these men the Government said actually handled the cash eventually delivered to the defendant, the Government would be hurt. Certainly the failure of the bank officials to corroborate such a transaction as this one would have cast such a doubt.

In January, 1963, the defendant's counsel made his motions for discovery and a bill of particulars. Item 7 of the latter was as follows:

> State the denomination of the $35,000 in money which was allegedly taken by the defendant, Levin. If the exact denominations are unknown, then give the approximate denominations.

The Government vigorously opposed the giving of this information. With regard to Item 7 in particular, the Government said:

> Paragraph 7 is indicative of the nature of defendant's motion—to secure the Government's evidence in advance of trial. Proceeding from the fact that the denominations of the bills used in the larceny is evidentiary, defendant can suggest no good reason as to how such knowledge would aid him

in respect to the functions of a bill of particulars as enumerated above.

It is, of course, not surprising that the defendant could not, in the Government's phrase, "suggest [any] good reason as to how such knowledge would aid him," since as of that time the defense appears not to have known of the fact that the check was initially cashed in $1000 bills, much less that these were immediately changed into $20's.[1]

Active opposition to an innocent request for information as to the bill denominations would surely, under these circumstances, create some sensations of discomfort in the more knowledgeable party. Such instincts are perhaps as good a guide as any to the need for voluntary disclosure. If, however, such feelings are successfully resisted but the defense comes upon the information by other means, no harm may be done; and this is essentially the basis upon which the Government seeks to sustain this conviction. To do so, in my view, it should, in the light of its earlier affirmative withholding, be able to demonstrate on the record that the defense did know of the $20 bill exchange in advance of trial.

Exactly when defense counsel first learned of these facts is far from clear. At the habeas corpus hearing, he testified that the Government did exhibit to him, apparently not long after the discovery hearing, the $35,000 check. His testimony also suggests that he may have first heard about the $1000 bills during the Cross trial, which took place in April, 1963. There is also a strong intimation that his first and only interview with McCeney came after the Cross trial, since the purpose of that interview was to inquire about records of "big bills."[2]

1. The Government's position *vis-a-vis* this request makes it useful to quote the following comment by Judge Frankel in the opinion referred to hereinabove (at p. 886 of 265 F.Supp.) :

Concluding that the Pitkin statements may be in part helpful to Karp, we have proceeded to inquire whether any "respectable interest" of the Government's may be served by withholding this material. The prosecutor was asked to speak on this question. He responded with the observations that "the defendants are engaging in a fishing expedition" and "that anytime [sic] discovery of material is ordered in derogation of the Federal Rules of Criminal Procedure, the Government is injured." We have not found enlightenment in these pronouncements.

2. In answer to questions by the Government seeking to establish his knowledge of Mr. McCeney and the latter's connection with the cashing of the $35,000 check, defense counsel testified as follows:
THE WITNESS: One. I had known Mr. McCeney before the trial and I knew that he held an office in the bank, I forget what it was, but I think it was an assistant vice president. Whether or not I referred to him in examining Mr. Olson is a matter of record and I do not recall it, because I have never read the record since the trial was completed. Thirdly, in the preparation of the case, I recall that I knew that this check

was of some importance because I had heard the Cross trial which took place before the Levin trial and I believe this check was mentioned. It was my understanding that when a check is cashed where large bills are given, that some record is kept by the bank and, in my mind, I had some vague notion of an Internal Revenue regulation to catch people who are cashing big checks.
MR. ARNOLD: Will you identify what check you mean when you say "this check"?
THE WITNESS: I am thinking of the check bearing Mr. Olson's name in some way or other, the check which Mr. Ashby says he took to the bank, that is the check I have in mind.
BY MR. ALTSHULER:
Q. The $35,000 check?
A. Yes, the one that was introduced at trial, that is the check. One day in preparing myself for the trial, I went over to see Mr. McCeney and without telling him what I had in mind, I asked him, in what must have been to him a casual conversation, whether records are kept when large bills are given out by the bank and I believe he told me that some records are kept but that they are destroyed very shortly.
I then asked another fellow, Mr. Fred Loops, who unfortunately is now dead, who was working at the Bank of Commerce—
THE REPORTER: How do you spell that name?

The Cross trial preceded the trial of this case by about five weeks.

The dissenting opinion states that defense counsel "testified in the habeas corpus hearing that he had learned from the Cross trial, in advance of the Levin trial, that the large bills had been changed into smaller ones." The actual answer was:

Q. When did you first learn from any source that the thirty-five $1,000 bills, in which the check was originally cashed on February 13th of 1959, might have been returned to the National Savings and Trust Company to be changed into bills of smaller denominations?

A. I think I heard testimony during the Cross trial along those lines, but I am not sure of that. As I was saying before, I was in a trial before Judge Walsh during the time that James Cross was being tried and I came into the courtroom intermittently as I could, and I believe that I heard testimony about the cashing of this check during the Cross trial which preceded the Levin trial.

The prosecutor then sought to establish by his questions what is beyond dispute, namely, that the $20 bill exchange came out in the testimony at the Levin trial; and the prosecutor conducting this examination summed it in this wise: "So you knew about it probably at the Cross trial, you certainly knew about it at the Levin trial * * *." For me, that "probably" is, because of the uncertainties in this record, at least at the outside

THE WITNESS: L-o-o-p-s, Mr. Loops, in another casual conversation with Mr. Loops, I was attempting to check the information that I got from Mr. McCeney and I asked Mr. Loops whether they, at the Bank of Commerce where I was then banking, kept records of the disbursement of large bills and he told me the same thing Mr. McCeney did, that the records they keep are destroyed very quickly, and that was the sum and substance of my relationship with Mr. McCeney in this case.

\* \* \* \* \* \*

limits of accurate characterization; and it is certainly short of the demonstration needed to retrieve the effect of the Government's initial denial of the request for the bill denominations.

It would be a reasonable evaluation of the habeas corpus record (and there is no express finding by the habeas corpus court to the contrary) [3] that defense counsel did not know of the $20 bill transaction until it first came out in the Government's case during the trial of his client. It is, of course, true that he made no request for a recess in order that he might investigate this matter, nor did he even telephone McCeney about it. He said at the habeas corpus trial that this was because he had already learned from McCeney that the bank had no records, but his testimony also was that his interview with McCeney, which arguably did not occur until after the Cross trial, was confined to asking whether the bank had any big bill transactions records. A teller at the bank might have remembered, even without records, an incident involving the changing of thirty-five $1000 bills into $20's. And, of course, Hooper, at the habeas corpus hearing, said for the first time not only that he would have been the one to have handled such a transaction but that, if it had occurred, he would have remembered it.

The scope of a defense investigation during the days preceding the trial is one thing. What, under the pressure of trial itself, counsel decides to do about new information is quite another.[4] For me, this is a case where, at the time the defense made a timely effort to get some

3. The finding in terms is that trial counsel learned of the $20 bills "at or prior to trial." But whether it was "at," or "prior", is critically important.

4. The difference lies in the loss of the invaluable privilege of pondering these matters reflectively in the course of preparing for trial, and not to have his client judged on the basis of his reaction to new information under the tensions and pressures of trial.

information about the denominations of the bills allegedly given to the defendant, the Government opposed it, even though it must be charged with knowledge that the bill-exchanging testimony, uncorroborated by the bank, was pregnant with significance for the defense. In the special setting of this case, it is perhaps not enough to avoid the danger of injustice that the Government may be said to have taken a technically accurate position with respect to a bill of particulars.

This can be regarded, therefore, as a situation where, within the meaning of Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the defense made an "actual request" of the Government for information which the Government deliberately refused, conscious of its danger to the prosecution and of the inequality which then existed between prosecution and defense in terms of their relative knowledge. Falling back to the Government's next line of defense, it is literally impossible to glean from this record a clear showing that no harm was done because the information became known in any event to the defense prior to trial.

In its brief upon this appeal, the Government refers to a deposition of Ashby in a civil case, used by defense counsel in cross-examining Ashby at the Levin trial. That deposition, in pertinent part, is as follows:

BY MR. DICKSTEIN:

Q. Mr. Ashby, we were speaking yesterday of the check for $35,000 drawn to Peter Olson as paying officer of Local 3. Do you remember that check?

A. Yes, sir.

Q. Do you know whether Mr. Olson cashed that check?

A. Yes, he did cash it.

Q. How do you know?

A. He gave me the cash to put in the vault in the safe.

Q. Did you go to the bank with him when he cashed it?

A. I can't recall. I may have.

Q. You don't remember?

A. It is vague. I may have gone with him to cash the check. I just can't recall.

Q. What were the denominations of the currency which Mr. Olson received?

A. That I don't know.

Q. What were the denominations of the currency that he gave you to put in the vault?

A. I know they were small bills. I don't recall the denominations. They were relatively small bills.

Q. By "small," do you mean less than $100 bills?

A. As I recall, they were less than $100 bills.

Q. It was not 35 $1,000 bills, was it?

A. No, not to the best of my recollection.

Q. When, in relationship to the date of the check, did he give you this money to put in the vault?

A. I don't know if it was the same day the check was drawn or a day later or two days later. It was in close proximity of the date of the check.

*     *     *     *     *     *

Q. And did you count the money before you put it in the vault?

A. I counted—Yes.

Q. What was the highest denomination of bill that you noted while you were counting the money?

A. I can't recall the exact denominations of the bills.

Q. Approximately.

A. There were quite a few bills. There may have been hundred-dol-

lar bills. I don't think there was anything larger than hundreds.

Q. Were most of them 20's and 10's?

A. Some of them were smaller than that; 20's I think. But I can't recall what the breakdown was.

Apart from the fact that the deponent is, in the light of his later testimony before the grand jury and at trial, being egregiously evasive, it can scarcely be said that pre-trial examination of this deposition would acquaint the defense with the fact that 35 one-thousand dollar bills were exchanged, at Levin's insistence, into $20 bills.

Neither is it clear beyond peradventure that the deposition was seen prior to the Levin trial. There was a day's interval at that trial between the direct examination of Ashby and his cross-examination. The record shows that defense counsel, while conducting that cross-examination, had only some written notes in his hand and not the deposition itself. When objection was made to this circumstance, the court recessed the trial so that the deposition could be obtained from the files of this court, where it was then reposing. Our Clerk's records do not show it as having been withdrawn earlier. It had doubtless been seen before by defense counsel, but no one can say when, or whether it might not have conceivably been after the Levin trial started. The Government did not introduce the deposition into evidence at the habeas corpus hearing, nor make any references to it in its effort to establish in that record exactly when trial counsel first learned of the $20 bill exchange.

Denial of rehearing en banc is not to be taken as indicating that the Government is required to honor a general request for any and all information helpful to a defendant—an approach expressly disavowed by Judge Frankel. I might have affirmed the habeas corpus judge in this instance, but on the facts the case would have been a close one. I think an en banc consideration would only embroil all of us in pondering the nuances of a record that can be read in more ways than one. In my view, the central inquiry *here* is whether affirmance on the facts of this case represents such a departure from established lines of legal doctrine as to justify *en banc* consideration. Applying that test here, I do not believe that rehearing *en banc* is warranted.

### Separate Statement on Vote to Deny Rehearing En Banc

J. SKELLY WRIGHT, Circuit Judge:

After much initial and determined opposition from judges and practitioners who value form over fact, the sporting theory of justice is slowly being eliminated from the trial of civil cases. Liberal provision for discovery has made the search for truth a realistic enterprise rather than an obstacle course festooned with devices for denying evidence to the unwary and the unadvised. Much the same movement is apparent in the trial of criminal cases, although for some arcane reasons the air of secrecy and competitiveness still attends the criminal trial.

Both the majority and the dissent here recognize that the principles of discovery should be applied in criminal cases. *See* Rule 16, FED.R.CRIM.P. Indeed the dissent notes that the "superiority of the prosecution's facilities for fact-gathering constitutes the basis for the duty to disclose exculpatory evidence and for the enforcement of it by setting aside convictions secured in part because of its violation." Levin v. Katzenbach, 124 U.S.App.D.C. 158, 165, 363 F.2d 287, 294 (1966) (dissenting opinion). Thus the only difference between the two positions is in their reading of the facts in this case.

Since Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in making the judgment whether due process is violated when exculpatory evidence is denied the defense, the focus is on the materiality of the evidence rather than "the good faith or bad faith

of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. If material evidence in the hands of the prosecution is denied the defense for whatever reason, the reviewing court must decide whether that denial might reasonably have affected the course and therefore the outcome of the trial.[1] That is what the panel tried to do here, and I see no reason why this court sitting *en banc* should upset the result it reached.

### Separate State re Rehearing En Banc

**DANAHER, Circuit Judge:**

I had no idea of writing anything in this case despite my very real view that the Government should have been permitted to press its contentions before, and to explain its position to, the full court.

However, as various of my colleagues now have submitted separate statements in exposition of their denial of rehearing *en banc,* one, in particular, would impart a gloss respecting "discovery" which impels my comment. I would not have silence taken as acquiescence in this area.

In the first place, writing separately in Ross v. Sirica,[1] I observed:

No amount of sophistry can obscure the ultimate fact that the sitting division had hoped to engraft upon our courts their own theory of discovery, notwithstanding that the Rules promulgated by the Supreme Court and approved by Congress, make no provision for any such result.

When Ross v. Sirica was cited to the Court of Appeals in the Second Circuit in Sciortino v. Zampano,[2] Judge Hays pointed out that the views of our court had not found favor in any other circuit. Indeed, he continued, the reasoning on which the *Ross* panel had relied even lacked the support of a majority of the judges of this Circuit. Judge Hays with appropriate citations quite correctly observed, as I had noted in *Ross,* that the subject of discovery in criminal cases had received a great deal of attention at the hands of those responsible for the original preparation of the Federal Rules and their recent amendment. Only a very limited discovery is available, and the principles agreed upon by the rule makers fall far short of the sweeping enlargement here asserted by one of our colleagues.

Again, and respecting another aspect of discovery, the Supreme Court in Brady v. Maryland[3] has stated its own holding thus:

We now hold that the suppression by the prosecution of evidence favorable to an accused *upon request* violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. (Emphasis added.)[4]

---

1. There is, of course, an affirmative duty on the part of the prosecution to disclose such evidence. The fact that the defense may not have moved for its production is irrelevant. Obviously the defense cannot move to have the Government produce what it does not know exists. Certainly if such evidence is not to be offered by the Government, it should be made available to the defense. In any event it should not be suppressed.

1. 127 U.S.App.D.C. 10 at 19–20, 380 F.2d 557 at 566–567 (1967).

2. 385 F.2d 132, 134 (1967).

3. 373 U.S. 83, 87, 83 S.Ct. 1194, 1196 (1963).

4. The "focus" mentioned by my colleague seems to have omitted "upon request."

One Justice speaking only for himself in Giles v. Maryland, 386 U.S. 66, 102, 87 S.Ct. 793, 811, 17 L.Ed.2d 737 (1967), noted that the Court had "included in its statement of the controlling principle" in Brady v. Maryland a reference to counsel's request but added that he saw no reason to make the result turn upon a "request." Four Justices deemed the limitations of the Rules to fall far short of the standard urged by their colleague. 386 U.S. at 116–119, 87 S.Ct. 793.

This is not to say that the rule makers may not some day go the full way seemingly desired by some of my colleagues. I say only that the Supreme Court and the Advisory Committee have not yet done so.[5]

### Separate Statement on Rehearing En Banc

BURGER, Circuit Judge:

I am satisfied that a majority of the entire court would never have reached the result decided by the majority of the present panel but at the same time less than five judges [1] believe the panel has laid down a new rule or doctrine of such scope and importance that it merits *en banc* review. Viewed in this light, the holding in Levin v. Katzenbach, 124 U.S. App.D.C. 158, 163, 363 F.2d 287, 292 (1966), is therefore confined to its own peculiar facts.

However I cannot refrain from pointing out, again, as I have before,[2] that the record before us shows—conclusively and beyond dispute—that the information which the panel majority regards as "newly discovered evidence" which Judges Bazelon and Edgerton held the prosecution should have revealed to the defense was in fact *literally in the hands of defense counsel* as he sat at counsel table and conducted examination of witnesses in the original trial. This is shown in Judge McGowan's opinion where he recites what Mr. Jacob Stein testified to at the remand hearing and also in the contents of the deposition which Stein utilized in this cross-examination.

It is not rationally possible to reconcile Mr. Stein's testimony with the notion that he was not aware of the transaction unless we are to assume that Mr. Stein was asleep or otherwise unaware of what was going on around him. Since Mr. Stein is one of the most experienced and able trial lawyers of our bar, I, of course, reject the idea that he did not grasp the facts. Moreover, Mr. Stein's appraisal of the situation was a sound one which any competent advocate would reasonably reach.

What is more important is that any tendency for anyone to read a "new rule" into this case is dispelled by what Mr. Justice Fortas said in Giles v. Maryland:

This is not to say that convictions ought to be reversed on the ground that information merely repetitious, cumulative, or embellishing of facts otherwise known to the defense or presented to the court, or without importance to the defense for purposes of the preparation of the case or for trial was not disclosed to defense counsel. It is not to say that the State has an obligation to communicate preliminary, challenged, or *speculative information*. But this is not that case

386 U.S. 66, 98, 87 S.Ct. 793, 809 (1967) (concurring opinion) (emphasis added). The highest classification which can fairly be accorded to the "information" which Judges Bazelon and Edgerton said the prosecution should have furnished is that it is "speculative" in an ultimate degree.

Perhaps a "footnote" to this case may not be out of order in relation to the time this court has taken to resolve issues which lead to commanding a new trial:

February, 1959—date of the alleged criminal acts;

November 1, 1962—Appellant was indicted;

May 10, 1963—conviction by jury for grand larceny;

June 30, 1964—the conviction was affirmed per Judges Washington and

---

5. Judges McGowan and Leventhal noted as much in Ross v. Sirica, *supra* note 1, 127 U.S.App.D.C. at 17, 380 F.2d at 562.

1. During consideration of the Government's motion for rehearing *en banc* this court has had only 8 active judges.

2. Levin v. Katzenbach, 124 U.S.App.D.C. 158, 163, 363 F.2d 287, 292 (1966); Levin v. Clark, 133 U.S.App.D.C. 6, 408 F.2d 1209, 1215, (Nov. 15, 1967).

Bastian (Bazelon dissenting), Levin v. United States, 119 U.S.App.D.C. 156, 338 F.2d 265 (1964);

February 1, 1965—a petition for writ of certiorari was denied by the Supreme Court, 379 U.S. 999, 85 S.Ct. 719, 13 L.Ed.2d 701 (1965);

February 25, 1965—Appellant filed a petition for a writ of habeas corpus which was denied by the District Court on June 11, 1965, 249 F.Supp. 225 (D.D.C.1965);

December 23, 1965—this court reversed and remanded the case, Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287 (1966), and took the extraordinary step—one never taken before—of releasing him from prison while the habeas corpus claims were being reconsidered;

October 25, 1966—the District Court resolved the remand question and the case returned here again, Levin v. Katzenbach, 262 F.Supp. 951 (D.C.C. 1966);

November 15, 1967—this court again reversed ordering a new trial and I dissented, Levin v. Clark, 133 U.S.App. D.C. 12, 408 F.2d 1215 (November 15, 1967).

The action of this court ordering a new trial was—and is—a gross miscarriage of justice which puts on the Government the burden of retrying a case on facts which occurred in February of 1959. Understandably the Government moved for rehearing *en banc* on January 10, 1968; this court's action on that petition alone has added approximately one year's delay.

The prosecution is now confronted with trying to reconstruct its case nearly 9 years after the event. The public should be pardoned if it loses confidence in the administration of criminal justice when it takes this long for the judicial process to dispose of a simple criminal case—and then only to order a new trial in circumstances where such trial will take place nearly a decade after the crime.